SENECA FIRE ENGINEERING, LLC

SUMMARY ANALYSIS REPORT

FIRE SPRINKLER SYSTEM FAILURE

**BEST WESTERN HOTEL**
**720 Complex Drive**
**Grand Rivers, Kentucky 42025**

Prepared by:

Daniel L. Arnold, P.E.*, FSFPE
Seneca Fire Engineering, LLC
1205 Johnson Ferry Road
Suite 136-400
Marietta, GA 30068

Submitted to:

Mr. Paul A. Dzenitis, Esq.
Reminger
Attorneys at Law
One Riverfront Plaza
401 West Main Street, Suite 710
Louisville, KY 40202

December 13, 2009

\* See App. B for States of Registration

SPRINKLER SYSTEM FAILURE                                     Page 1 of 19
BEST WESTERN HOTEL                                          December 13, 2009
GRAND RIVERS, KENTUCKY

## Introduction

At approximately 2:30 p.m. on December 4, 2006, a guest discovered water when entering Building No. 3 of the Best Western Hotel located at 720 Complex Drive in Grand Rivers, Kentucky. The Best Western hotel consists of three, two-story buildings (Building Nos. 1, 2 and 3) built of wood frame construction with shingled hip roofs. The hotel guest informed the on-duty hotel staff member, Mr. Doug McClanahan, who was not previously aware of the water condition.

Subsequent investigation determined that the water discovered in Building No. 3 was discharging from an opened fire sprinkler in the building's attic dry pipe fire sprinkler system. There was no fire. Water flowing from the opened sprinkler caused damage to the hotel.

Mr. McClanahan was reportedly not aware that the fire sprinkler was flowing water before being informed by the guest. Notes from an interview conducted by others on January 25, 2007 indicate that Mr. McClanahan heard no related alarms from the hotel's fire alarm panel at the time of the loss. It is not known how long water flowed from the sprinkler before being discovered by the guest and reported to Mr. McClanahan.

The fire alarm devices in all three of the hotel's buildings were intended to be monitored by a single Silent Knight Model 5207 fire control/communicator panel located in Building No. 1. The standard Silent Knight Model 5207 is an 8 zone, hardwired local alarm panel suitable for supervising and operating connected heat and smoke detectors, manual fire alarm stations and sprinkler system supervisory and water flow devices. The Silent Knight panel has a built-in digital communicator for connection to an off-site monitoring facility. However, for unknown reasons, the Silent Knight panel at the Best Western was not monitored off-site and was only configured to generate alarms locally for action by hotel staff.

According to the written zone list on its outside cover, the Silent Knight panel's zones were:

    Zone 1 - Building No. 1 Pull Stations

Case 5:08-cv-00122-TBR  Document 26-2  Filed 12/14/09  Page 3 of 15 PageID #: 81

Zone 2 - Building No. 2 Pull Stations
Zone 3 - Building No. 1 Low Air
Zone 4 - Building No. 1 Tamper
Zone 5 - Building No. 2 Low Air
Zone 6 - Building No. 2 Tamper
Zone 7 - Building No. 3 Pull Stations
Zone 8 - Building No. 3 Sprinkler

*(Note: During January 25, 2007 post-loss testing by Schaefer Engineering, Inc., it was revealed that only a single fire alarm circuit was routed from the Building No. 3 sprinkler system switches (i.e. a pressure switch and a tamper switch) to the Silent Knight panel in Building No. 1. This single circuit was terminated as <u>Zone 6</u> (i.e. on Terminals 15 and 16); not Zone 8 as indicated on the panel's front cover. Additionally, the Building No. 3 tamper switch created a "<u>Trouble</u>" indication on Zone 6 at the Silent Knight panel when tested on that date (which is an incorrect response). The pressure switch caused a Zone 6 "<u>Supervisory</u>" event indication. The building's local alarm buzzer or siren did not activate during activation of either switch. These observations are further discussed later in this report.)*

The Silent Knight panel is provided with a memory that records events received by the panel to facilitate identification/disposition of events and to assist in troubleshooting system problems by qualified fire alarm service technicians during required testing, inspection and maintenance. The National Fire Alarm Code (NFPA 72) requires frequent testing, inspection and maintenance of required fire alarm systems; however, there were no records of the any fire alarm system testing or inspections conducted by or for the hotel reviewed. Additionally, there was no indication in the documents reviewed that the event memory of the Silent Knight panel (if not erased) was reviewed or recorded after the loss to document available event activity as part of the post-loss investigation. (Even if user level memory files are erased, hidden history files are often maintained in such panels that may be accessible to qualified fire alarm technicians. There was no indication that the possible existence of any hidden memory file was determined or obtained for the Silent Knight panel as part of the post-loss investigation.)

Users (i.e. hotel staff) operate the Silent Knight panel with pushbuttons located behind the panel's front cover. These pushbuttons include "Reset Alarm", "Silence", "Clear Memory", "Display Memory", "Display Trouble", "Clear", "Disable" and "Enter". Each pushbutton causes a different panel response/result when depressed individually or in combination.

Handwritten operating instructions (presumably for the hotel staff's use) were taped to the inside front cover of the Silent Knight panel. The handwritten instructions read:

SPRINKLER SYSTEM FAILURE  
BEST WESTERN HOTEL  
GRAND RIVERS, KENTUCKY  

Page 3 of 19  
December 13, 2009

> *"First step - Find out wich (sic) building alarm is for.*
>
> *Step two - Check breaker bor (sic) for pump. Check all rooms for fire.*
>
> *Step 3 - Silence alarm by pressing __silence__ + enter (Emphasis added)*
> *If memory mode light is on press #2 (clear memory) + enter"*

An additional 'sticky note' read

> *"if memory mode light On, Press #2 & Enter"*
>
> *"FIRE ALARM PULLS*
> *To silence alarms, press __Reset Alarm__, Press enter (Emphasis added)*

As indicated above, an investigation to determine the cause of the Building No. 3 water loss was undertaken after the loss by Schaefer Engineering, Inc. The results of this investigation are described in a report entitled "Sprinkler System Evaluation Report" dated May 10, 2007. The Schaefer report concluded, in part, that:

- The dispersion of water was the result of water trapped in the dry pipe sprinkler system which subsequently froze and caused the sprinkler in the attic to open.

- The trapped water was created by an improperly sloped branch line that was probably "introduced during the original system installation" in approximately 1992 or 15 years before the loss.

- The subject sprinkler system was monitored by a deficient local fire alarm system in that the system failed to activate an alarm and notify onsite personnel of the flowing sprinkler.

- The deficient condition of the alarm system "contributed to the magnitude of damage sustained by the building because it resulted in a delayed notification of the incident."

On November 8, 2005 approximately 1 year before the water loss, a loss control survey was conducted at the hotel by an unknown property insurance representative or other party. Attachment 1 of the Schaefer report includes Page 2 from the related loss prevention report that includes a partial listing of the "Loss Control Recommendations". Recommendation 2005-11-1 notes that:

> *"Your sprinkler system should be tested annually by a qualified contractor. ... The automatic fire protection sprinkler system provided in the building has not been serviced*

SPRINKLER SYSTEM FAILURE  
BEST WESTERN HOTEL  
GRAND RIVERS, KENTUCKY

Page 4 of 19  
December 13, 2009

> *since April of 2004. Services by a contractor of automatic sprinkler systems should include:*
>
> *a) Annual water flow and alarm tests.*
> *b) Sealing or locking of valves in normal or open position...*
> *c) Tripping dry-pipe valves as required by NFPA 25 (i.e. annual tripping with control valve partially open and tripping every years with control valve wide open.)"*

Three weeks later, on November 29, 2005, American Fire Protection, Inc. (American) conducted a test and inspection of the hotel's sprinkler systems including conducting tests of the installed dry pipe valves. Reports of these sprinkler system tests and inspections are provided in Attachment 2 of the Schaefer report. There was no documents reviewed indicating that the recommended annual testing of the alarm system was ever conducted.

Approximately 1 year later, on September 5, 2006, American responded to a service call request from the hotel in response to a loss of power at the property. Upon their arrival to reset the hotel's three dry pipe sprinkler valves (1 per building and reportedly numbered accordingly), American noted that "System 1 had already been set up by maintenance man." American reportedly set up System 2 after replacing the system's gages. However, the dry pipe valve for System 3 would not set up due to a worn clapper gasket. System 3 was set up 'wet' until needed repair parts could be ordered and installed.

On or about October 4, 2006 the System 3 dry pipe valve gasket was replaced after which the dry pipe valves were tested and inspected by American. American's related inspection reports of this work indicate the each sprinkler system's electric and supervisory alarms were tested and operated satisfactory. These tests were conducted by American sprinkler technician David Irvine. In his deposition, Mr. Irvine testified that he checked the operation of the electric and supervisory alarms by telephone with Ms. Sue Barrett, hotel manager who was at the Silent Knight panel in Building No. 1 during the testing. Mr. Irvine further testified that audible alarms did not sound at Building No. 3 during the testing; alarms only occurred at the Silent Knight panel located in Building 1 as were confirmed by Ms. Barrett over the telephone.

According to a work order, American responded to an additional service call at the Best Western on October 30, 2006 in response to a dry pipe trip in Building No. 1. (Note: The Schaefer report

SPRINKLER SYSTEM FAILURE
BEST WESTERN HOTEL
GRAND RIVERS, KENTUCKY

Page 5 of 19
December 13, 2009

indicates that Mr. Barry Duncan, hotel maintenance at the time stated that the October 30, 2006 work was performed in Building No. 3; not Building No. 1.)

The Schaefer report correctly notes that the water flow incident should have activated the facility's fire alarm system providing prompt notice to hotel staff which apparently did not occur in this instance. Schaefer contends that the cause of the failure to report was the electrical installation of an inappropriate Pumptrol pressure switch on the Building No. 3 dry pipe system. The Schaefer report observed that this inappropriate switch may not activate in the event of a water flow and "in and of itself, could be the cause for a lack of an audible alarm detected during the subject incident." The report further noted that "closing of the alarm (sic) pressure switch, which was the intended status (sic) to signal water flow, resulted in a "<u>supervisory</u>" condition at the main control panel, but did not activate the local buzzer or the main control panel fire alarm siren." (Emphasis added.)

As a result of the above, the Schaefer report makes the following additional observations and contentions.

- The selected Pumptrol pressure switch installed in this application was not appropriate

- The installation of the Pumptrol pressure switch "was a deficient condition because the alarm system would not activate in the event of a water flow incident."

  *(Note: An 'alarm' pressure switch on a dry pipe valve should activate when the dry pipe valve open or 'trips'. This does not necessarily correlate to "water flow.")*

- The alarm (sic) pressure switch created a "supervisory" condition at the main control panel which was a deficient condition.

- The hotel's fire alarm system was not in compliance with NFPA. *(Note: Presumably NFPA 72, the National Fire Alarm Code.)*

- The identified fire alarm system deficiencies existed at the time of American's October 2006 testing and inspection of the hotel's sprinkler systems.

- Lastly, if American had "adequately performed the required inspection/test procedure in October 2006, the alarm system deficiencies should have been detected and addressed."

The above observations and contentions are further outlined and detailed in the Schaefer Report. However, the report, in summary, contends that:

> *"..., the dry-pipe sprinkler system piping network contained a branch line with an improper slope, which trapped water and subsequently froze. ... The system was installed in, or around 1992 and it is probable the improperly sloped branch line was the result of deficient work performed during the system's original installation.* **Per NFPA 25, contractors performing post-installation inspections... are not required to verify proper slopes of the piping... in concealed locations and ... would not be responsible for ... detecting and correcting..."**
>
> *The sprinkler system alarm (sic) pressure switch was improperly configured and could potentially fail to respond... Furthermore, when ... triggered, the alarm system failed to activate the building's fire alarm. These <u>alarm system</u> (emphasis added) deficiencies contributed to the magnitude of water damage sustained by the building because it resulted in a delayed notification of the incident.* **American Fire Protection was responsible for detecting, but failed to identify, these alarm system deficiencies during their October 2006 service on the system."**

Seneca Fire Engineering, LLC was retained to review and analyze the circumstances of the December 4, 2006 water loss with a focus on the technical opinions and contentions outlined in the Schaefer report. This report has been prepared to summarize the results of that review to date. In preparing this report, I have reviewed the Schaefer report, its attachments and other available information including photographs, depositions and exhibits, codes and standards, product information and other related material. A listing of the documents reviewed is provided in Appendix A.

The conclusions and opinions expressed in this report are based on my knowledge, education and experience in fire protection engineering, fire suppression systems, fire detection and alarm system and related codes, standards and practices. A resume further describing training and experience and a listing of prior testimony is provided as Appendix B.

The analysis and opinions expressed in this report are based on the information reviewed to date. If additional information becomes available, the opinions expressed may change as a result and the report amended or supplemented as appropriate.

**Discussion and Analysis**

Fire Alarm System Deficiencies

The Schaefer report states that deficiencies in the hotel's fire alarm system contributed to the magnitude of water damage sustained by the building because it resulted in a delayed notification of the incident. While the magnitude of the alleged increase in damage caused by the contended delay is not quantified or described qualitatively (discussed later), the Schaefer report generally cites that the identified causal fire alarm system deficiencies were:

1. The installation of the Pumptrol alarm (sic) pressure switch was not appropriate or functionally reliable for the application used.

2. The Silent Knight fire alarm panel was programmed to treat the activation of the Pumptrol pressure switch as a "supervisory" event vs. an "alarm" event which would have sounded connected notification appliances.

3. The test and inspection of the fire sprinkler systems conducted by American in October 2006 should have detected these deficiencies in the fire alarm system permitting them to be addressed.

Pumptrol Pressure Switch – The Schaefer report states that a Gem Model F3021 dry pipe valve was not properly trimmed per the manufacturer's technical data sheet. Referring to the Pumptrol pressure switch as an "alarm" pressure switch, the report notes that the pressure switch was installed on the 'system air pressure' side of the dry valve. The report further concludes that the Pumptrol pressure switch should have been installed on the 'alarm line' plumbed to the dry pipe valve's alarm port. I disagree. It is apparently not known when or who installed and wired the Pumptrol pressure switch. Nevertheless, the Pumptrol pressure switch was likely installed to function as a "supervisory" <u>low air pressure switch</u> and as not an "alarm" pressure switch as referred to in the Schaefer report. This arrangement is entirely consistent with the dry pipe valve trim diagram and its intended operation, the Silent Knight panel's zone listing for Building Nos. 1 and 2 (i.e. Zone 3 and 5) and the performance of the pressure switch and fire alarm system during the post-loss January 25, 2007 testing conducted by Schaefer (i.e. reporting as a "Supervisory Alarm"). Photographs or information on the trim arrangement for the dry valves in Building Nos. 1 and 2 were not provided as part of the documents received.

SPRINKLER SYSTEM FAILURE
BEST WESTERN HOTEL
GRAND RIVERS, KENTUCKY

Page 8 of 19
December 13, 2009

From a review of provided material, it is likely that the dry pipe systems installed at the Best Western initially relied on external water motor alarms along with a separate 'sprinkler supervision system' discussed below for indication of dry pipe operation. During their post loss testing, Schaefer Engineering noted that the Building No. 3 water motor alarm functioned properly albeit at a sound level that "was not overly apparent unless observed from the outside and on the same side of the building..."

It is important to note that fire alarm systems are not typically configured to sound notification appliances upon receipt of "Supervisory" events such as signals received from a low air pressure switch on a dry pipe system. Additionally, "Supervisory" events do not create a fire alarm signal and can usually be 'silenced' at the alarm panel without being 'reset'. It was noted that the operating instructions posted on the Silent Knight Panel were to "silence alarm by pressing silence and enter" and then clear the event memory. These actions could effectively discard any "Supervisory" event that may have been received. Additionally, during post-loss testing it was revealed that the Pumptrol pressure switch in Building No. 3 was connected to and reported as "Zone 6" of the Silent Knight Panel which directed hotel staff to the <u>Building No. 2</u> tamper switches. (Note: The Building No. 3 sprinkler system was indicated as "Zone 8" on the Silent Knight panel. Documents reviewed did not reveal whether or not Zone 8 (Terminals 18 and 19) indicated as "Building No. 3 – Sprinkler" on the panel cover was ever evaluated and tested during the post-loss investigation to determine the devices it monitored.)

Based on the above, it is possible, if not likely that the Pumptrol low air pressure did in fact operate and signal the Silent Knight panel sometime prior to the water flow event and was misinterpreted as 'Building No. 2', silenced and erased from memory in accordance with the posted operating instructions. Unfortunately, however, because the Silent Knight panel was not monitored offsite, the Zone 8 circuit was apparently not evaluated after the loss, and the event history was either erased or not retrieved, the occurrence of such a signal cannot be confirmed.

It should be noted that the zone labeling discrepancies (and any failure of the 'sprinkler supervision system' discussed below) would have only been known to or discernable by Ms. Barrett who was reportedly monitoring the panel during the October 4, 2006 sprinkler system

testing according to Mr. Irvine's deposition. The fire alarm system deficiencies would also have been revealed if the hotel had provided for the proper and required tests and inspections of their building fire alarm system by a qualified fire alarm contractor.

In addition to the Silent Knight panel, Building No. 3 was provided with some accessory electrical supervision equipment referred to in the Schaefer report as a 'sprinkler supervision system' (Figure 15 in the Schaefer report.) This separate electrical system was not approved for sprinkler supervision and apparently consisted of an Altronix Relay Module, power supply, siren and battery. This electrical equipment was located in a separate equipment room from the dry pipe system where American conducted the October 2006 sprinkler system inspection and testing. Based on the limited information available, it appears that this 'supervision system' may have been disconnected or not functional at the time of the loss and presumably during the October 2006 testing by American. Additionally, there were no records provided that this separate electrical 'supervision system' was ever tested either separately or as part of required fire alarm testing. Because this electrical system was separate from the dry pipe sprinkler system and not approved or properly supervised for such use, its failure to operate would not have been discoverable by American during their testing of the sprinkler systems in October 2006.

It is clear from the information reviewed that the fire alarm system installed at the Best Western hotel was indeed deficient. It is also clear that the system was typically operated in an improper manner by silencing alarms and then erasing the resulting event history. However, it is not at all clear that these deficiencies were or could have been discernable to American during the sprinkler system testing they performed in October 2006.

Improperly Sloped Branch Line

Dry pipe sprinkler system piping normally contains pressurized air rather than water. Air pressure is maintained by a compressor and regulator arrangement which acts on a dry pipe valve (located in a heated area) to prevent water from entering the piping until required in response to a fire. This prevents freeze damage and impairments to the system that can be caused by frozen water in the pipes. When a downstream sprinkler opens in response to the heat of a fire, the pressurized air is released from the piping network which opens or "trips" the dry pipe valve

Case 5:08-cv-00122-TBR   Document 26-2   Filed 12/14/09   Page 11 of 15 PageID #: 89

SPRINKLER SYSTEM FAILURE
BEST WESTERN HOTEL
GRAND RIVERS, KENTUCKY

Page 10 of 19
December 13, 2009

allowing water to enter the piping network and discharge from any opened sprinklers. At Building No. 3, a Gem, Model F3021 dry pipe valve was installed to serve the attic dry pipe system and dry pendant sprinklers on the second floor

Due to their application in unheated areas that are subject to freezing, special criteria and requirements exist that must be followed in the proper design and installation of dry pipe sprinkler systems. One critical aspect is to assure that all of the dry pipe sprinkler system piping is provided with complete drainage capability.

Proper and complete drainage is required to assure the capability to remove all residual water from dry pipe system piping to prevent its accumulation and potential freezing when exposed to sufficiently cold temperatures. The freezing of residual water in piping can cause breaks in the piping and/or prevent the proper operation of the dry pipe valve by inhibiting the release of the pressurized air in the case of a fire.

To prevent the accumulation of residual water in dry pipe system piping, NFPA 13 requires that all dry pipe system piping be drainable and appropriately pitched. Specifically, dry pipe system branch lines must be pitched or sloped at least ½-inch per 10 feet; feed mains at least ¼-inch per 10 feet to specified drain locations. All trapped piping sections (i.e. low points) must also be provided with a drain valve to facilitate the removal of water.

The Schaefer report states that the sprinkler that opened was installed at the end of an improperly sloped branch line that was measured after the loss at a 4 ½ - inch negative slope (i.e. away from the system drain). This improperly sloped branch line is illustrated in Figures 5 through 8 of the Schaefer report as well in other file photographs. In the report, it is also stated that this improperly sloped branch line probably occurred at the time of original installation in approximately 1992; approximately 15 years prior to the loss citing the following factors:

- The subject branch line was routed under a roof truss member that was notched specifically for the pipe.

- The notch was created to avoid a physical constraint between the 'trunk line' and roof truss member.

- The slope deficiency was not a simple matter of an improperly adjusted pipe hanger.

- There was a stated consistency of the mounting method to secure the pipe with the rest of the piping system.

Schaefer correctly concludes that this method of supporting the sprinkler piping was not in compliance with the requirements of NFPA 13 and that American was not responsible for detecting and correcting the improperly sloped branch line during their October 2006 inspection.

However, based on my review of available photographs (Schaefer Photographs 99 – 133), I do not agree that the improperly sloped branch line probably occurred during original installation. In my opinion, it is more likely that the improperly sloped branch line was created by an unknown and inexperienced person sometime after the dry pipe trip tests conducted by American on November 29, 2005 (Attachment 2 of the Schaefer Report) and before Mr. Barry Duncan started as maintenance person at the hotel in July of 2006. This opinion is based on the following observations:

- Had the improperly sloped branch line existed as found for 15 years, it is extremely likely that such freeze damage would have occurred prior to December 4, 2006 during an intervening winter from non-drainable water that would have existed/accumulated from the piping system's initial hydrostatic testing and/or subsequent dry pipe valve testing.

- The 2x4 support used to hold the branch line appears to have been adapted from a prior use. (ex. Schaefer Photograph 111). Similar 2x4 members can be seen being as "truss holders" in several photographs. (ex. Schaefer Photographs 122, 130)

- The 2x4 support holding the branch line shows a coach screw rod inserted. Coach screw rods were often used in the early 90's to support sprinkler piping and are now known to be susceptible to 'pull out' as the wood dries/ages. (ex. Schaefer Photograph 99)

- Coach screw rods screwed directly into the bottom of truss members were also used to support the same branch line elsewhere in the attic. (ex. Schaefer Photographs 122, 127)

- There appears to be a screw hole in the truss directly above the 2x4 at the end of the branch line as would be created by a coach screw pullout. (ex. Schaefer Photograph 101)

- The bearing surface on the top of the branch line created by the notched truss member would have created an increased downward force on a coach screw at the end of the branch line contributing to a possible pull out. (ex. Schaefer Photograph 121)

SPRINKLER SYSTEM FAILURE  
BEST WESTERN HOTEL  
GRAND RIVERS, KENTUCKY

- Photographs of the branch line at the 2x4 support show a burnish mark on the galvanized pipe surface as often occurs from strap type sprinkler hangers such as those used elsewhere on the branch line. (ex. Schaefer Photographs 111, 113)

It should be noted that the above timing for creating the improperly sloped branch line (i.e. November 29, 2005 to July of 2006) is also consistent with the 2005 date code of the sprinkler retained as evidence that was initially indicated by American as the one they being replaced after the loss. It should also be noted that freeze damage to sprinklers does not also result in a complete opening of a sprinkler; sometimes only a small leak is created to relieve pressure from frozen residual water. Lastly, on a least one occasion thereafter (September 2, 2006) a dry pipe valve had already been set-up by hotel maintenance before American arrived for a service call.

Notes by Schaefer Engineering indicate that Mr. Mike Patel, owner of the hotel at the time of the loss had only acquired the property 'a couple of years' before but no specific acquisition date was provided.

Duration of Flow/Differential Damage

The Schaefer report states that the deficient condition of the alarm system "contributed to the magnitude of damage sustained by the building" because it resulted in a delayed notification of the incident. However, there is no qualitative or quantitative discussion of the magnitude of the alleged increase in damage caused by the contended delay.

It is clear that the freeze damage to the sprinkler branch line and resulting water loss would have occurred even if the identified fire alarm deficiencies were known to and remedied by the hotel prior to the event. Assuming time for alarm notification, fire department response and investigation and actions needed to shut off the sprinkler system, it could be expected that the opened sprinkler would discharge for 15 to 30 minutes before the flow of water could reasonably be stopped. A single sprinkler (Tyco TY3151 as well as the other sprinklers installed in the attic) would discharge approximately 35 to 40 gallons per minute resulting in a total of 500 to 1,200 gallons of water being discharged into the attic during this time.

SPRINKLER SYSTEM FAILURE  
BEST WESTERN HOTEL  
GRAND RIVERS, KENTUCKY

Page 13 of 19  
December 13, 2009

Such a large quantity of water would likely have caused significant damage to Building No. 3 notwithstanding the contended delay caused by the deficient fire alarm system. The Schaefer report does not address or provide any information that addresses the extent of differential damage.

### Conclusion

Based on my review and analysis as described above, the alleged failures attributed to American Fire Protection in the Sprinkler System Evaluation Report dated May 10, 2007 prepared by Schaefer Engineering are either not sufficiently supported to a reasonable degree of certainty or are not demonstrated as being causal to the resulting water loss and damage that occurred at Building No. 3 on December 4, 2006.

If any opinion expressed changes as a result of additional information, the report will be amended or supplemented as appropriate.

Prepared by:

*[signature]*

Daniel L. Arnold, P.E.*, FSFPE

\* See App. B for States of Registration

SPRINKLER SYSTEM FAILURE  
BEST WESTERN HOTEL  
GRAND RIVERS, KENTUCKY

Page 14 of 19  
December 13, 2009

## Appendix A

1. Sprinkler System Evaluation Report prepared by Schaefer Engineering, Inc. issued on May 10, 2007 and Attachments

2. Schaefer photographs 07-002-001 through 07-002-218

3. Rule 26 Disclosure Documents provided by Schaefer Engineering, Inc.

4. American Fire Protection, Inc.'s Answers to Plaintiff's First Set of Interrogatories and Request for Production

5. Deposition transcript of Mr. David Johnston taken on July 16, 2009

6. Deposition transcript of Mr. David Irvine taken on July 16, 2009

7. Various manufacturers technical product data information

8. Various NFPA codes, standards and other related documents including NFPA 13, NFPA 13R and NFPA 72.